# United States Court of Appeals
## For the First Circuit

---

No. 23-1736

THOMAS MELONE,

Plaintiff, Appellant,

ALLCO RENEWABLE ENERGY, LIMITED; ALLCO FINANCE LIMITED,

Plaintiffs,

v.

JANET COIT, in her official capacity of Assistant Administrator,
National Marine Fisheries Service; NATIONAL MARINE FISHERIES
SERVICE; VINEYARD WIND 1, LLC,

Defendants, Appellees,

DEBRA HAALAND, in her official capacity of Secretary of the
Interior; JOHN A. ATILANO, II, Colonel, in his official capacity
of Commander and District Engineer; MARTHA WILLIAMS, in her
official capacity of Principal Deputy Director; US DEPARTMENT OF
THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; GARY FRAZIER,
in his official capacity of Assistant Director for Endangered
Species; US ARMY CORPS OF ENGINEERS; US FISH AND WILDLIFE
SERVICE,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

---

Before

Kayatta, Lynch, and Gelpí,
Circuit Judges.

————————

Thomas Melone and Allco Renewable Energy Limited on brief for appellant.

Todd Kim, Assistant Attorney General, Environment & Natural Resource Division, U.S. Department of Justice, Mark Arthur Brown, Kevin W. McArdle, and Thekla Hansen-Young, Environment & Natural Resource Division, U.S. Department of Justice, and Lea Tyhach, and Gladys P. Miles, Office of the General Counsel, National Oceanic and Atmospheric Administration on brief for the federal appellees.

David T. Buente, Jr., Peter C. Whitfield, James R. Wedeking, Kathleen Mueller, Jack W. Pirozzolo, and Sidley Austin LLP on brief for intervenor-appellee Vineyard Wind 1, LLC.

————————

April 25, 2024

————————

KAYATTA, **Circuit Judge**.  This case is one of two appeals in which various residents of Martha's Vineyard and Nantucket oppose the construction of an offshore wind project aimed at reducing reliance on fossil fuels by providing energy sufficient to power 400,000 Massachusetts homes.  Common to the two cases is the assertion that federal agencies failed to follow the law or good science -- as viewed by the residents -- in assessing the possible impact of the project on the endangered North Atlantic right whale.  Our decision issued yesterday in Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Management, et al., (23-1501), rejected a challenge to a biological opinion issued by the National Marine Fisheries Service ("NMFS") and relied on by the Bureau of Ocean Energy Management ("BOEM") in permitting the construction of the wind power project.  In this case, we consider a challenge to NMFS's issuance of an Incidental Harassment Authorization ("IHA") to the project's developer -- Vineyard Wind 1, LLC ("Vineyard Wind") -- the receipt of which was also necessary to construct the project.  As we will explain, we find this challenge also to be without merit.

## I.

We first briefly rehearse the statutory background, facts, and procedural history of the case.

**A.**

The Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., generally prohibits the "tak[ing]" of marine mammals. 16 U.S.C. § 1371(a). "Take" means "to harass, hunt, capture, or kill" a marine mammal, or to attempt to do so. Id. § 1362(13). The MMPA then delineates two kinds of "harass[ment]." Level A harassment means "any act of pursuit, torment, or annoyance" that "has the potential to injure a marine mammal or marine mammal stock in the wild." Id. §§ 1362(18)(A)(i), (18)(C). Level B harassment is less serious and means "any act of pursuit, torment, or annoyance" that "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." Id. §§ 1362(18)(A)(ii), (18)(D).

The MMPA includes certain exceptions to its general take prohibition. See, e.g., id. § 1371(a)(1)-(2). As relevant here, the MMPA provides that "upon request . . . by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographic region," NMFS shall authorize, for periods of not more than one year, "the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock" if the agency finds, among other things, that "such harassment during

each period concerned will have a negligible impact on such species or stock." Id. § 1371(a)(5)(D)(i)(I). NMFS's authorization -- the IHA -- must then prescribe, where applicable, "permissible methods of taking by harassment pursuant to such activity, and other means of effecting the least practicable impact on such species or stock," as well as "requirements pertaining to the monitoring and reporting of such taking." Id. § 1371(a)(5)(D)(ii).

The process that applicants must follow to obtain an IHA is set forth in detail in NMFS's implementing regulations. See 50 C.F.R. § 216.104. Once the applicant has supplied the information required by the regulations, NMFS must then determine, based on the best available scientific evidence, whether the taking by the specified activity within the specific geographic region would have a negligible impact on marine mammal stocks. Id. § 216.104(c).

**B.**

In 2009, BOEM began evaluating the possibility of wind energy development in the Outer Continental Shelf offshore from Massachusetts, pursuant to its authority under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 et seq. After several years of review and public coordination, BOEM

- 5 -

identified and made available for leasing an area south of Martha's Vineyard and Nantucket.

In 2015, BOEM awarded a commercial wind energy lease to Vineyard Wind covering a 166,886-acre (or 675 square kilometer) area.  In 2017, Vineyard Wind submitted a proposed construction and operations plan to BOEM for review and approval.  The project would consist of wind energy infrastructure capable of generating around 800 megawatts of clean wind energy, enough to power 400,000 homes.  The infrastructure would be constructed in a roughly 76,000-acre zone within the lease area.

In September 2018, Vineyard Wind requested an IHA from NMFS to ensure compliance with the MMPA, because, as relevant here, noise from proposed pile-driving activities during construction of jacket and monopile foundations could incidentally disturb right whales.

The North Atlantic right whale is listed as endangered under the Endangered Species Act, 16 U.S.C. § 1531 et seq., and is therefore protected by the MMPA.  See 35 Fed. Reg. 18,319, 18,320 (Dec. 2, 1970); 16 U.S.C. § 1371(a)(3)(B); id. § 1362(1).  While they once numbered in the thousands, only 368 right whales remained as of 2019, according to NMFS's estimate.  See Int'l Ass'n of

Machinists Local Lodge 207 v. Raimondo, 18 F.4th 38, 41 (1st Cir. 2021).

In April 2019, NMFS published notice in the Federal Register regarding its proposal to issue an IHA to Vineyard Wind. NMFS then requested comment on the proposed IHA.

On a parallel track, NMFS also considered the potential impact of issuing Vineyard Wind an IHA by participating as a cooperating agency in BOEM's review of the project proposal under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. BOEM evaluated the environmental impact of the project and memorialized its analysis in an environmental impact statement ("EIS"). Meanwhile, NMFS conducted a biological consultation pursuant to the Endangered Species Act ("ESA"), producing a "biological opinion" for BOEM that analyzed the project's effects on ESA-listed species. BOEM issued a final EIS in March 2021. See 86 Fed. Reg. 14,153 (Mar. 12, 2021). In May 2021, BOEM, NMFS, and other cooperating agencies issued a joint record of decision based on the EIS, which allowed for the installation of up to eighty-four wind turbines at select sites, subject to avoidance, mitigation, and monitoring measures identified in the EIS. NMFS then issued a separate decision memorandum explaining why it

adopted BOEM's EIS in support of its proposal to issue Vineyard Wind the IHA.

On May 21, 2021, NMFS issued the IHA to Vineyard Wind. In June 2021, NMFS published notice of its approval of the IHA under the MMPA.  See 86 Fed. Reg. 33,810 (June 25, 2021).  As relevant here, the IHA authorizes the non-lethal, incidental Level B harassment of no more than twenty North Atlantic right whales.

As detailed in the notice of issuance, NMFS evaluated Vineyard Wind's proposed construction activities and their potential impacts on fifteen species of marine mammals that it found may occur in the area, including right whales.  NMFS provided a description of right whales and their presence in the project area, as well as detailed the status of the declining population of right whales.  The agency explained that the project area is part of an important migratory area for right whales, who also use the area to feed.  And it noted that aerial surveys showed right whale sightings in the project area only between December and April.

NMFS explained that pile-driving activities in connection with the construction of up to eighty-four wind turbine generators and one or more electrical service platforms in the 75,614-acre project area (the "specified geographic region") was expected to create underwater noise that would result in Level B

harassment.  The agency determined that noise from pile driving is the only source of right whale incidental harassment associated with project construction.  To estimate incidental harassment from pile-driving noise, NMFS considered acoustic thresholds above which the best available science indicates that marine mammals would be impacted, the area that would contain noise above those levels in a day, the occurrence of marine mammals in that area, and the maximum potential number of days during which pile-driving activities would be permitted (102 days between May and November).

NMFS predicted that, given the extensive mitigation measures to be adopted, no Level A harassment of right whales would occur.  Those measures include the use of seasonal restrictions on pile driving, where pile driving would only take place from May to November, and could only extend to December if unforeseen circumstances arose and BOEM approved the extension.  Other measures include the use of sound attenuation devices, acoustic monitoring devices, trained protected species observers during construction, soft-start pile-driving procedures, and vessel strike avoidance measures.[1]

NMFS determined that the twenty right whales subject to Level B harassment constituted 5.4% of the population (estimated

---

[1]  Vineyard Wind tells us that, due to unexpected delays, it has not yet installed all monopile foundations, but will seek to do so this coming fall.

at 368 as of 2019), and that the amount was a "small number[]" of right whales under the MMPA. The agency made its small numbers finding "based on an analysis of whether the number of individuals taken annually from a specified activity is small relative to the stock or population size."

NMFS also determined that the authorized harassment would result in a "negligible impact" on the right whale population. It determined that the whales affected by pile-driving noise may temporarily abandon their activities while swimming away from the noise, temporarily avoid the project area, and experience a temporary hearing impairment. But it determined that exposure to pile-driving noise would not impact any essential behavioral patterns or annual rates of recruitment and survival, nor would any right whale be injured or killed.

**C.**

In July 2021, plaintiff Thomas Melone -- a part-time resident of Martha's Vineyard, and owner of two solar energy companies joined as plaintiffs -- filed suit in the District of Massachusetts against NMFS, BOEM, and other federal agencies and officials, alleging that the Vineyard Wind project approvals violated various federal statutes, including the MMPA.

Vineyard Wind moved to intervene as a defendant. Melone opposed the request, and the federal defendants took no position. The district court granted Vineyard Wind leave to intervene

permissively under Federal Rule of Civil Procedure 24(b), while denying it leave to intervene as of right pursuant to Rule 24(a). In so doing, the district court found that Vineyard Wind has significant interests at stake in this litigation (including, among other things, over $300 million already invested in the project and contracts worth over $3 billion to install the facility); that the outcome may impair its ability to protect those interests; and that it had agreed to work with existing parties to avoid unnecessary delays in the proceedings.

Melone eventually filed his operative second amended complaint, which asserted only two counts under the MMPA relating to NMFS's issuance of the IHA to Vineyard Wind. Count I alleged that NMFS did not comply with certain timing-related requirements of the MMPA, 16 U.S.C. § 1371(a)(5)(D), when it issued the IHA. Count II alleged that NMFS's interpretation of various provisions of section 1371(a)(5)(D) improperly led it to issue the IHA to Vineyard Wind, and that such action is arbitrary, capricious, and unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The parties then cross-moved for summary judgment.

The district court granted summary judgment in favor of NMFS and Vineyard Wind in full. As to Count I (the dismissal of which Melone does not appeal), the court found that NMFS did not comply with certain notice procedures under the MMPA, but that any such error was harmless. As to Count II, the district court held

that NMFS complied with the MMPA in issuing the IHA to Vineyard Wind.

This appeal followed, in which Melone challenges (1) the district court's order permitting Vineyard Wind to intervene as a defendant and (2) the district court's order entering summary judgment for defendants NMFS and Vineyard Wind on Count II.

**II.**

We consider first Melone's challenge to the district court's order granting Vineyard Wind permission to intervene under Federal Rule of Civil Procedure 24(b).

We review a district court's disposition of a motion for permissive intervention for abuse of discretion, reviewing subsidiary conclusions of law de novo and factual findings for clear error.  T-Mobile Ne. LLC v. Town of Barnstable, 969 F.3d 33, 38 (1st Cir. 2020) (citing Int'l Paper Co. v. Inhabitants of Town of Jay, 887 F.2d 338, 343 (1st Cir. 1989)).

Under Rule 24(b), a district court may allow the intervention of any party who "has a claim or defense that shares with the main action a common question of law or fact."  A district court's determination of whether to grant a motion for permissive intervention is "highly discretionary," Liberty Mut. Ins. Co. v. Treesdale Inc., 419 F.3d 216, 227 (3d Cir. 2005) (internal quotation omitted), and it may consider "almost any factor rationally relevant" in making that determination, Daggett v.

<u>Comm'n on Gov. Ethics and Election Pracs.</u>, 172 F.3d 104, 113 (1st Cir. 1999).

The district court denied Vineyard Wind's motion to intervene as of right under Rule 24(a) but granted its motion for permissive intervention under Rule 24(b). In so doing, the district court noted what was obvious -- Vineyard Wind "has significant interests at stake in this litigation and that the outcome may impair its ability to protect those interests."

Melone contends that Vineyard Wind was required to establish independent Article III standing before intervening. But this is not so, given that Vineyard Wind simply seeks to defend the agency's position. <u>Cf.</u> <u>Town of Chester</u> v. <u>Laroe Estates</u>, 581 U.S. 433, 439–40 (2017) (holding that an intervenor as of right must establish independent standing to seek additional relief beyond that sought by a party with standing); <u>Va. House of Delegates</u> v. <u>Bethune-Hill</u>, 139 S. Ct. 1945, 1951 (2019) (noting that intervenor's participation in support of other existing defendants did not require invoking the court's jurisdiction, and thus did not require that it independently demonstrate standing, until intervenor alone sought to appeal the district court's order).

Melone's remaining challenges to the intervention ruling fare no better. There was no abuse of discretion in the district court's finding that Vineyard Wind has a significant stake in, and

thus shares a common question of fact with, this litigation. And, in any event, Melone fails to argue, let alone demonstrate, that the intervention in any way prejudiced his substantial rights. Rife v. One West Bank, F.S.B., 873 F.3d 17, 19 (1st Cir. 2017) (explaining that arguments not raised in an opening brief on appeal are deemed waived). And absent that showing, any such error would not warrant disturbing the district court's single entry of summary judgment for NMFS and Vineyard Wind. Cf. Prete v. Bradbury, 438 F.3d 949, 960 (9th Cir. 2006) (finding harmless the district court's erroneous grant of intervention). Melone's objection to Vineyard Wind's presence in this case therefore fails.

### III.

We consider now Melone's challenge to the district court's order awarding summary judgment to NMFS and Vineyard Wind. He argues only that the district court erred in finding that NMFS complied with the MMPA in issuing the IHA to Vineyard Wind. And he further limits that argument by training his sights on two alleged errors. First, he argues that NMFS's determination that the incidental harassment of up to twenty right whales constituted a "small number" under the MMPA was arbitrary, capricious, and unlawful. Second, he argues that NMFS's consideration of the "specified activity . . . within a specific geographic region" where incidental harassment may occur for purposes of Vineyard

Wind's IHA was impermissibly narrow in scope. We recite our standard of review and then treat Melone's arguments in turn.

**A.**

We review the district court's grant of summary judgment de novo. Dubois v. U.S. Dep't of Agric. 102 F.3d 1273, 1283 (1st Cir. 1996). In so doing, we review the agency's compliance with the MMPA under the Administrative Procedure Act ("APA"). Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 901-02 (9th Cir. 2012). Under the APA, we may not set aside an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). "A decision is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

**B.**

Melone's principal argument on appeal is that NMFS erred in finding that the proposed incidental harassment of up to twenty

right whales (or 5.4% of its population) constituted a "small number" of the species, as required to grant the IHA under the MMPA.  See 16 U.S.C. § 1371(a)(5)(D)(i).  He argues that the agency has adopted a "blanket policy" under which it will determine any take of up to one-third of a species' stock to be a "small number" under the MMPA.  He then argues that this policy is both arbitrary and capricious and constitutes an unreasonable interpretation of the MMPA.

Under the MMPA, NMFS may only authorize the incidental take of "small numbers of marine mammals of a species or population stock" via the issuance of an IHA.  16 U.S.C. § 1371(a)(5)(D)(i) (emphasis added).  The MMPA does not define "small numbers." Legislative history shows that Congress recognized "the imprecision of the term 'small numbers,' but was unable to offer a more precise formulation because the concept is not capable of being expressed in absolute numerical limits."  H.R. Rep. No. 97-228, at 19 (1981), as reprinted in 1981 U.S.C.C.A.N. 1458, 1469. NMFS has accordingly adopted a "proportional approach," whereby it "compares the number of individuals taken to the most appropriate estimation of abundance of the relevant species" to determine whether the authorized take is limited to "small numbers" of that species.  The Ninth Circuit has upheld the U.S. Fish and Wildlife Service's ("FWS") use of such a proportional approach under the

MMPA as a reasonable interpretation of the MMPA.  See Salazar, 695
F.3d at 906-07.[2]

Here, in assessing whether Vineyard Wind's activity
would incidentally harass only "small numbers" of right whales,
NMFS determined that, pursuant to its proportional approach, its
authorization to inflict Level B, non-lethal harassment on up to
twenty right whales -- constituting less than 5.5% of its
population stock -- was a "relatively small percentage[]" of that
stock.   After Melone brought suit challenging the agency's
determination, NMFS then defended its approach before the district
court by noting that "NMFS has set the upper limit for 'small
numbers' under [its] proportional approach as one-third of a
species' population."   The agency then cited an unrelated final
rule, which stated that "[c]onsistent with past practice, when the
estimated number of individual animals taken . . . is up to, but
not greater than, one-third of the most appropriate species or
stock abundance, NMFS will determine that the number of marine
mammals taken of a species or stock are small."   Now, Melone argues
that the agency improperly rubberstamped Vineyard Wind's proposed

---

[2]   Salazar also held that NMFS and FWS, when promulgating
incidental take regulations under the MMPA, must make separate
findings as to whether the authorized take constitutes "small
numbers" of the species and if it would have a "negligible impact"
on the species.   See 695 F.3d at 903-05.   Melone does not argue
that NMFS failed to make the requisite distinct findings here.

Level B harassment of 5.4% of the right whale population simply because it is less than one-third.

On appeal, NMFS walks back its invocation of this so-called one-third rule in the face of Melone's attempt to hoist the agency by its own petard. It argues that we need not reach the issue of what constitutes the upper limit of the term "small numbers," and that the agency did not rest its "small numbers" finding here on the grounds that the non-lethal harassment of up to twenty right whales affected less than one-third of the species' population. As a result, NMFS contends that Melone cannot challenge the agency's erstwhile use of the one-third rule here, where it formed no part of the agency's reasoning in issuing Vineyard Wind the IHA.

We agree with NMFS. The record shows that the agency only invoked the one-third upper limit as a belated post hoc rationalization of its "small numbers" finding in litigation. There is no evidence in the administrative record that it played any role in the agency's decisional process or that the agency otherwise applied the policy in determining whether to issue Vineyard Wind the IHA. It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale. See SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943). As a result, to the extent

Melone takes issue with NMFS's "small numbers" determination based on its ostensible application of a hard-and-fast one-third rule, his argument fails.[3]

Putting aside Melone's critique of the agency's one-third rule, he offers little to otherwise support a finding that the non-lethal harassment of twenty right whales (or 5.4% of its population) is not a "small number."  Indeed, other courts have upheld similar agency determinations, and Melone presents no persuasive counterpoint.  See, e.g., Native Vill. of Chickaloon v. NMFS, 947 F. Supp. 2d 1031, 1052–53 (D. Alaska 2013) (upholding NMFS's determination that a take of 10% of the beluga whale population affected a "small number" of beluga whales).

Melone argues in passing that "small numbers" should be limited to the "potential biological removal" threshold for right whales, which is less than one.  The MMPA defines "potential biological removal" as the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  16 U.S.C. § 1362(20).  However, the IHA does not authorize the lethal take of any right whales --

---

[3] We thus need not and do not consider the propriety of such a one-third rule.  We hold only that the agency's determination on this record that 5.4% of the right whale population constituted a "small number" for purposes of the MMPA was not arbitrary, capricious, or otherwise unlawful.

it only authorizes temporary, non-lethal harassment of up to twenty right whales.  And, as NMFS notes, the MMPA does not require consideration of potential biological removal as part of the IHA process.  Rather, the statute's use of the term refers to the development of commercial fishery take-reduction plans.  Compare id. § 1371(a)(5)(D), with id. § 1387(f)(2).  If anything, the agency already considered the impact of the authorized harassment on the species as part of its distinct "negligible impact" analysis, which Melone does not challenge.  As a result, Melone's argument fails.

In summary, it is clear from the record that NMFS applied its scientific expertise to consider the nature of Vineyard Wind's activities and the type of harassment expected to occur, to quantify the proposed take based on pile-driving noise relative to the right whale population, and to make a separate finding that the proposed take would have a "negligible impact" on the species. See Native Vill. of Chickaloon, 947 F. Supp. 2d at 1051; see also City of Taunton v. EPA, 895 F.3d 120, 126 (1st Cir. 2018) (noting that under the APA's arbitrary and capricious standard of review, a court's deference is heightened when an agency's decision-making relies on its scientific and technical expertise).  Given these

considerations, we find no fault with the agency's "small numbers" determination here.

## C.

Melone next argues that NMFS improperly segmented Vineyard Wind's "specified activity" that might result in incidental take and the "specific geographic region" within which that activity would occur for purposes of issuing the IHA. First, he argues that the statute requires a collective approach to IHA approval, and that it was error for NMFS to consider only Vineyard Wind's "specified activity" rather than also those of others engaging in similar activities contemporaneously. Second, he argues that NMFS improperly let Vineyard Wind define the "specific geographic region" as a 75,614-acre portion of the lease area, and that the region itself was impermissibly narrow in scope. Across both arguments, Melone's essential claim is that the agency's approach improperly segments applicant activities and regions so that the IHA appears to authorize the non-lethal harassment of only "small numbers" of right whales while ignoring its cumulative effect on the species. We consider each argument in turn.

## 1.

The MMPA provides that IHAs may be issued "[u]pon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specific geographic region." 16 U.S.C. § 1371(a)(5)(D)(i). NMFS

regulations define "specified activity" as "any activity, other than commercial fishing, that takes place in a specified geographical region and potentially involves the taking of small numbers of marine mammals." 50 C.F.R. § 216.103. Those regulations similarly define "specified geographic region" as "an area within which a specified activity is conducted and that has certain biogeographic characteristics." Id. NMFS regulations also prescribe that IHA applicants must include descriptions of the relevant specified activity and the geographic region within which incidental take may occur in their application. See 50 C.F.R. § 216.104.

Melone claims that the MMPA mandates that NMFS analyze collectively all activities similar to those proposed by Vineyard Wind because the statute refers to applications by "citizens" and specifically excludes "commercial fishing." However, the statutory provision at issue concerns whether NMFS shall grant an IHA to a particular permittee, whether composed of a citizen or citizens. The process is plainly applicant-driven. Moreover, nothing in the MMPA expressly requires that NMFS analyze a broader range of activities outside the scope of an individual IHA application. See 18 U.S.C. § 1371(a)(5)(D); 50 C.F.R. § 216.104. As NMFS notes, the statute does not require it to consider takes resulting from all activities proposed by all citizens undertaking similar activities, but rather only those citizens who submit the

request.  Additionally, the statute excludes "commercial fishing" not because "specified activity" is meant to refer to a similarly broad category of activities, but because commercial fishing operations are regulated under a different provision of the MMPA. See 16 U.S.C. § 1387.

Relevant legislative history also shows that Congress intended that "specified activity" be "narrowly identified so that the anticipated effects" resulting from the activity "will be substantially similar."  H.R. Rep. No. 97-228, at 19 (Sept. 16, 1981).  That House Report noted that it would not "be appropriate for the Secretary to specify an activity as broad and diverse as outer continental shelf oil and gas development," but that activities "should be separately specified as, for example, seismic exploration or core drilling."  Id.  Here, based on Vineyard Wind's IHA application, NMFS considered the "specified activity" to be pile driving associated with project construction during a one-year period, including the use of vessels to support pile installation.  To do so was neither arbitrary nor capricious.

Melone also argues that NMFS failed to consider the cumulative effect on right whales resulting from other activities apart from those proposed by Vineyard Wind.  But this too misses the mark.  As NMFS notes, it did consider the effects of ongoing and past anthropogenic activities aside from Vineyard Wind's project as part of its "negligible impact" analysis, which analyzes

- 23 -

the species' density, distribution, population size, growth rate, and other relevant stressors.  Additionally, NMFS explained when issuing the IHA that NEPA required it to "evaluate[] the direct, indirect, and cumulative effects of the [IHA]," which it did by participating as a cooperative agency in BOEM's development of the project's EIS.  It also considered such factors when preparing its biological opinion for BOEM in compliance with the ESA.  Meanwhile, Melone challenges none of those determinations here.  As a result, his argument fails.

2.

Finally, Melone argues that NMFS improperly limited the region in which covered activities would occur to that which Vineyard Wind delineated in its IHA  application -- a 74,614-acre portion of the 675-square-kilometer lease area.  He argues that NMFS must determine the region based on similar "biogeographic characteristics," see 50 C.F.R. § 216.103, and that such a region should encapsulate the right whale's broader habitat up and down the eastern shoreline from Maine to Florida, or at least the entire area south of Martha's Vineyard where right whales are known to mate and forage.

The MMPA left the term "specific geographic region" undefined.  The House committee report, however, noted that the region "should not be larger than is necessary to accomplish the specified activity, and should be drawn in such a way that the

effects on marine mammals in the region are substantially the same." H.R. Rep. No. 97-228, at 19 (Sept. 16, 1981). "Thus, for example, it would be inappropriate to identify the entire Pacific coast of the North American continent as a specified geographical region, but it may be appropriate to identify particular segments of that coast having similar characteristics, both biological and otherwise, as specified geographical regions." Id.

NMFS defends its approach by arguing that it need not define the region more broadly for purposes of the IHA because it already considered the impact on the entire right whale population as they migrate through the project area. As noted, it did so in its "negligible impact" analysis, its biological opinion, and in its participation in BOEM's EIS. In its view, there is "no take that would result from the project for which NMFS failed to account." Moreover, the agency argues that the area in question is precisely where Vineyard Wind's pile-driving activities, and therefore incidental harassment, would occur, and that this area shares similar biological characteristics. As a result, it argues -- and we agree -- that Melone's overarching concern that the agency's narrow delineation of the "specific geographic region" threatens to ignore the project's broader effect on the right whale population is unwarranted. We therefore find that here, the

agency's delineation of the "specific geographic region" was proper.[4]

## IV.

We need go no further.  For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.

---

[4]  Melone also appeals, at length, the application of what is known as the <u>Chevron</u> doctrine.  <u>See</u> <u>Chevron</u> v. <u>Nat. Res. Def. Council</u>, 467 U.S. 837 (1984).  But because we find no need in this case to defer to any interpretation by the agency of any statute or regulation, we have no reason to consider whether and how that doctrine might otherwise apply.